UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JANE DOE, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 17 CV 3688 |
| | ) | |
| HARPERCOLLINS PUBLISHERS LLC | ) | **JURY TRIAL DEMANDED** |
| and LAURA KIPNIS, | ) | |
| Defendants | ) | |

## COMPLAINT

Plaintiff JANE DOE, by and through her counsel, Salvatore Prescott & Porter, PLLC, brings this action against Defendants HARPERCOLLINS PUBLISHERS LLC and LAURA KIPNIS, as follows:

## I.    INTRODUCTION

1.    In April of 2017, HARPERCOLLINS PUBLISHERS LLC published a book written by Northwestern University professor LAURA KIPNIS entitled *Unwanted Advances: Sexual Paranoia Comes to Campus.*  The book has received wide-spread national media attention, including front page coverage in *The New York Times* and in other national publications.

2.    In the book, which critiques the Title IX processes under which colleges investigate sexual discrimination complaints, KIPNIS gives significant prominence to sexual assault and sexual harassment allegations made by two Northwestern students against her friend and colleague—former Northwestern philosophy professor, Peter Ludlow.  In defending Ludlow and attempting to (falsely) reframe him as the victim of

1

malicious female students and a Title IX process run amok, KIPNIS gratuitously discloses private and embarrassing details about the personal life of Plaintiff, a current Northwestern graduate student. KIPNIS writes about and publicizes private text messages and information about Plaintiff obtained from Ludlow and contained in confidential Northwestern records. Many of these text messages were taken out of context, none of them were fact-checked with Plaintiff, and all of them were private communications that Plaintiff never intended to be publicized for the world to read.

3.     In addition to disclosing private details about the Plaintiff's personal life, KIPNIS made and HARPERCOLLINS published false and damaging statements about Plaintiff and presented her in a false light as lying, manipulative, and litigious, despite having reason to know that this portrayal was false. Defendants made multiple misrepresentations of fact about Plaintiff, including misrepresenting the nature of Plaintiff's relationship with Ludlow and misrepresenting a number of facts about Plaintiff—including falsely claiming that she had initiated sexual harassment charges against a male student and that she had made up an allegation of rape against Ludlow.

4.     Defendants recklessly pursued fame and profit without regard for the harm their actions would cause to Plaintiff, a young and promising graduate student who -- rather than being on a mission to end Ludlow's career (as Kipnis suggests) -- in fact only very reluctantly came forward to disclose his conduct after she learned of other allegations of inappropriate sexual conduct with students. Now, as a result of Defendants' misrepresentations about Plaintiff and the disclosure of private and embarrassing personal

facts about her life, her personal life and professional career prospects have been upended and her reputation has been significantly harmed.

## II.    JURISDICTION AND VENUE

5.    This Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332, because the parties are citizens of different states, and the amount in controversy exceeds $75,000.  Specifically, Plaintiff is an individual who is domiciled in Illinois. Defendant HARPERCOLLINS PUBLISHERS LLC is a Delaware limited liability company based in New York City.  Defendant LAURA KIPNIS is an individual who is domiciled in New York.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the events giving rise to the claims occurred in this district.

## III.    PARTIES

7.    Plaintiff JANE DOE is a graduate student in what should be her final year of a PhD program in Northwestern University's Department of Philosophy.  Prior to the publication of *Unwanted Advances,* which contains multiple false statements about Plaintiff and discloses private facts regarding Plaintiff's life, Plaintiff had a promising career in the field of Philosophy.  She planned to seek a job in academia this fall.

8.    Defendant HARPERCOLLINS PUBLISHERS LLC is a company that publishes books.  HARPERCOLLINS is based in New York and published *Unwanted Advances*.

3

9.     Defendant LAURA KIPNIS is a Professor at Northwestern University's School of Communication.  Her research and writing focus on gender issues and cultural criticism.

## IV.     FACTUAL ALLEGATIONS

**Peter Ludlow Pursues an Inappropriate Romantic Relationship with Jane Doe, a PhD Student in His Department**

10.     In or about 2011, Plaintiff applied to a PhD program in philosophy at Northwestern University, one of the top philosophy programs in the country.

11.     After she applied, Plaintiff attended a recruitment weekend for prospective graduate students.  Plaintiff was one of only a handful of female graduate students that the department was recruiting that year, as the field of philosophy, and Northwestern's philosophy department in particular, is male-dominated.

12.     During the weekend, a social gathering for the prospective students was held at the home of Peter Ludlow, a nationally prominent philosopher and at the time a professor in the Department.

13.     At the gathering, Ludlow (who was in his fifties) spoke extensively and virtually exclusively to Plaintiff, a 24-year-old whom he had just met earlier in the day.  He expressed interest in Plaintiff's intellect and area of academic interest and was singularly focused on Plaintiff.

14.     During the recruitment party, Ludlow took Plaintiff into his bedroom.  He printed out and gave her copies of unpublished papers he was working on.  He told Plaintiff that she "had to come to Northwestern" and that she "had to work with him."  He also told

her: "I want you to tell me everything you want," and then suggested that he could get her invited to a prestigious philosophy conference in Scotland that summer.

15.     As Ludlow was a leader in his field, Plaintiff was extremely flattered by his interest and desire to mentor her.  He was a decisive factor in her choosing Northwestern for her graduate studies.

16.     However, when Ludlow followed up with an email invitation to spend the summer in Scotland with him, at a house he was renting, and with a plane ticket he would pay for, Plaintiff began to feel uneasy—particularly because he asked her not to tell others about his offer.

17.     Plaintiff reached out to a female faculty member in the philosophy department to let her know what had occurred.  That professor informed the chair of Northwestern's philosophy department about Ludlow's conduct.

18.     Plaintiff subsequently turned down the offer to travel to Scotland with Ludlow.

19.     In fall 2011, Plaintiff began graduate studies at Northwestern.

20.     During the first semester, she enrolled in a seminar with Professor Lackey, the professor in whom she had confided Ludlow's overtures.  When Ludlow learned this, he decided to attend the seminar as well.  It was unclear at the time why he was attending, but he participated fully in the class.  Plaintiff took it as indicative of the intellectual rigor of the Northwestern faculty that they sat in on each other's classes.  Later, she came to believe that Ludlow enrolled in the course primarily as a way to get close to her and interact with her.

5

21.     Initially, Plaintiff and the other students enjoyed the opportunity to have two faculty members participating in the seminar discussions.   Plaintiff also initially appreciated that she was becoming the subject of Ludlow's intellectual focus.  He invited her to co-author a paper with him.  He began inviting her and another student out for meals. He began communicating with her on a daily basis about her research and shared intellectual ideas.  As Plaintiff was also attending a class taught by Ludlow, he quickly made himself a central and daily focus of her first several months at Northwestern.

22.     Initially, Plaintiff found the attention and interest intellectually stimulating. Moreover, she was alone and new to Evanston without friends or family support.  Ludlow inserted himself into Plaintiff's life and came to dominate her time.

23.     He began taking her to meals alone, asking her to spend time with him alone, and inviting her to his apartment in the city.  He began confiding in Plaintiff about his romantic life, talking incessantly about the many much younger women he was dating.  He treated Plaintiff as a confidante and asked her advice about his dating life. (At one point, he told her "don't worry, you're too old for me.")

24.     It became clear to Plaintiff that Ludlow was lonely.  She felt flattered and needed by him.  Also, he was prominent in his field, a brilliant philosopher, and someone who would evaluate her progress as a graduate student.

25.     Sometime in late October or early November 2011, Ludlow kissed Plaintiff. He told her: "Well I guess you'll have to decide what kind of relationship we have."  During that same period, he routinely acknowledged to Plaintiff that he could get in trouble for his behavior if anyone found out.

6

26.     Plaintiff did not reciprocate the kiss, and reminded Ludlow that she had a long-term boyfriend (who was living in Boston at the time).

27.     From mid-October through December 2011, Ludlow was insistent in his efforts to persuade Plaintiff to have a romantic, sexual relationship with him. Plaintiff was increasingly unsure of how to handle this pressure. She wanted to stave off any romantic relationship while maintaining the academic and intellectual relationship with her mentor, who was teaching one of the classes she was attending, writing an academic paper with her, and would have a role in her career and evaluating her progress towards her PhD.

28.     By this point, Plaintiff had become isolated from her colleagues in the graduate program. Ludlow exerted more and more control over her—one time yelling at her and driving erratically with her in the car when she told him that she was going to switch paper topics. "We. Had. A. PLAN!" he yelled at her. Plaintiff began to have serious concerns about the power he exerted over her as well as her growing dependency and inability to get out from under his control.

29.     At the same time, Ludlow continued to pressure Plaintiff into a sexual relationship. Although she made a series of compromises in terms of allowing some physical intimacy, she made clear that she would not have sex with him.

30.     Ludlow was not happy about this and complained that Plaintiff was not paying adequate attention to him. In mid-November, when Plaintiff's boyfriend came to campus from out of town, Ludlow engaged in a series of angry and jealous interactions with Plaintiff about him.

31.     Then, shortly after the visit from her boyfriend, Ludlow had drinks with Plaintiff. She became intoxicated. When she awoke the next morning, she was in Ludlow's apartment, unclothed, and in his bed. It was clear that he had had sexual intercourse with her at some point during the night, but Plaintiff had no memory of what had happened.

32.     Plaintiff was extremely upset. But as she was still a student in his department and they were working on a joint academic paper together, Plaintiff tried to maintain a sense of normalcy. She felt love for Ludlow as a mentor and had grown emotionally intimate with him, and his injection of physical intimacy was confusing and upsetting to Plaintiff. Increasingly uneasy about the relationship, Plaintiff departed campus as soon as possible for the holiday break. Once she was out of Evanston and away from Ludlow, it became clear to her how inappropriate the relationship was and that she had to end all personal contact with him.

33.     On or around January 6, 2012, Plaintiff returned after a month away, and Ludlow met her at the airport. While on the taxi ride home, Plaintiff told him that she felt he had taken advantage of her and had manipulated her and that she couldn't have any sort of personal relationship with him. He became upset.

34.     Plaintiff eventually told Ludlow that she was no longer able to work on the paper they were co-authoring.

35.     Plaintiff subsequently took an incomplete in a Philosophy of Language course. She simply could not take courses in Ludlow's area of focus because of the intense emotional strain resulting from what she had experienced. She also eventually failed to meet every single fourth year goal for the program.

**After Much Deliberation, Jane Doe Reluctantly Files a Complaint against Ludlow**

36.     On or about February 28, 2012, the philosophy department was contacted by Northwestern's Title IX coordinator regarding a sexual misconduct complaint filed by a first year undergraduate student against Ludlow.  The Title IX coordinator asked whether there was anyone else who she should speak to.  The faculty member who spoke to the Title IX office offered Plaintiff's name—noting that Ludlow had seemed particularly close to the Plaintiff.

37.     On or about February 29, 2012, Plaintiff met with the Title IX coordinator. The Title IX coordinator asked Plaintiff to go on record about her experiences with Ludlow, but Plaintiff expressed fear and reluctance to do so given Ludlow's position in the academic community and in the department where she was being evaluated for her PhD.

38.     On or around March 14, 2012, the Title IX office emailed Plaintiff, again urging her to go on record with the details of what had happened with Ludlow.  Plaintiff once again refused to come forward, fearing retaliation and negative effects on her career.

39.     Northwestern proceeded to investigate the undergraduate's complaint without Plaintiff's input, and Ludlow was eventually disciplined.

40.     For the next academic year, Plaintiff worked on her graduate work, but had a difficult time.  She was not able to focus, and was depressed; many days she was unable to get out of bed.  She had been unable to confide in anyone about the details of what had happened with Ludlow, including the unconsented sexual intercourse.

41.     In February of 2014, the undergraduate student who had accused Ludlow of sexual misconduct sued Northwestern for Title IX violations.   Her allegations of sex harassment and sexual assault by Ludlow became public.

42.     At the time that the news of the undergraduate's lawsuit became known publicly, Plaintiff was attending an academic conference in Bogota, Colombia.  The female faculty member whom she had previously confided in regarding Ludlow's invitation to Scotland was there, too, and noticed that Plaintiff looked upset.  She asked if everything was ok.  Plaintiff disclosed what had occurred with Ludlow.

43.     Plaintiff did not share with the faculty member the incident of non-consensual sex, which was very upsetting for Plaintiff to discuss.

44.     After Plaintiff returned from Colombia, the faculty member informed Plaintiff that she was obliged to report what Plaintiff had told her to Northwestern.

45.     Plaintiff expressed concern about reporting to Northwestern administration what had occurred.   She also disclosed at that point that Ludlow had engaged in unconsented sex with her.

46.     In or around February 2014, the faculty member contacted Northwestern's Title IX office regarding Plaintiff's disclosures, prompting the Title IX office to email Plaintiff.  Plaintiff expressed that she still was afraid to speak with anyone at Northwestern about what had occurred because Ludlow was powerful and well-known, and it would ruin her career academically to come forward.

47.     Eventually, however, in light of the allegations by the undergraduate student and additional information that Plaintiff learned about involving Ludlow's alleged

10

misconduct with another student, Plaintiff became convinced that the right thing to do was to come forward. Plaintiff at that point agreed to make a complaint.

48. Northwestern hired an outside investigator to investigate Plaintiff's allegations against Ludlow. In her report, the investigator expressed that Plaintiff was extremely credible, noting that she had agreed to cooperate and go on the record despite great personal risk.

49. The investigator ultimately concluded that Ludlow had engaged in sexual harassment towards Plaintiff, but found that she did not have enough evidence to determine whether or not a sexual assault had occurred.

50. Northwestern commenced a termination hearing against Ludlow. In the midst of that termination hearing, Ludlow resigned from the Northwestern faculty.

**Laura Kipnis Writes About The Allegations Against Ludlow and Jane Doe Files a Retaliation Complaint Against Kipnis**

51. Following the dismissal of Ludlow's lawsuit, in or around February 2015, Defendant LAURA KIPNIS wrote and caused to be published in *The Chronicle of Higher Education* an article entitled "Sexual Paranoia Strikes Academe." In the article, which primarily addressed KIPNIS's opinion that professors should be allowed to date students, KIPNIS included references to Ludlow's Title IX proceeding. Thereafter, two Northwestern students, including Plaintiff, filed Title IX complaints against KIPNIS.

52. The basis of the Title IX complaints against KIPNIS was that she had misrepresented certain facts about the Plaintiff's complaint and suggested that the complaint brought against Ludlow (one of her colleagues) lacked merit.

53.     On or about May 29, 2015, KIPNIS caused to be published in *The Chronicle of Higher Education* a second article entitled, "My Title IX Inquisition."  In the article, KIPNIS expressed outrage at being the subject of Title IX complaints.

**Kipnis Retaliates Against Plaintiff by Writing *Unwanted Advances,* Grossly Mischaracterizing the Relationship between Plaintiff and Ludlow and Making False and Damaging Statements About Plaintiff**

54.     On or about April 4, 2017, Defendant HARPERCOLLINS PUBLISHERS LLC released a book written by Defendant LAURA KIPNIS, titled *Unwanted Advances: Sexual Paranoia Comes to Campus*.  *Unwanted Advances* generally describes how modern college campuses implement Title IX and criticizes procedures that KIPNIS deems unfair to people accused of sexual assault.

55.     Plaintiff takes no issue with Defendant LAURA KIPNIS's choice to write on this topic.    Likewise, Plaintiff does not object to Defendant HARPERCOLLINS PUBLISHERS LLC's choice to publish a book that explores these issues.

56.     *Unwanted Advances*, however, goes well beyond describing and criticizing Title IX processes.  Indeed, it needlessly devotes an entire chapter to Plaintiff, to whom Defendant KIPNIS assigns a thinly-disguised pseudonym.  That chapter contains wholly gratuitous private facts about Plaintiff's personal life—facts never before publicized, and facts that Plaintiff did not want publicized.  Among other things, KIPNIS wrote and Defendant HARPERCOLLINS PUBLISHERS LLC published:

>        i.   Facts concerning an alleged sexual relationship between Plaintiff and a married man who teaches at another academic institution, someone KIPNIS refers to in the book as "Professor X";

12

ii.  Personal details about Plaintiff's relationship with Ludlow never before made public;

iii.  Private text messages between Plaintiff and Ludlow, many of which were printed out of context and written about in a misleading manner; and

iv.  Excerpts from Northwestern University Title IX investigation records that the University must treat as confidential pursuant to federal law.

57.  It was highly offensive to Plaintiff, as it would be to any reasonable person, that Defendant LAURA KIPNIS included these facts in her book and that Defendant HARPERCOLLINS PUBLISHERS LLC publicized them.  These are intimate details of Plaintiff's personal life regarding some of the most personal and emotionally difficult experiences that Plaintiff has gone through.  Although some bits and pieces of the information in *Unwanted Advances* had trickled out through Ludlow's lawsuit, KIPNIS and HARPERCOLLINS included far more detail, including embarrassing and sensitive facts never previously in the public domain.

58.  The facts that Defendant LAURA KIPNIS included about Plaintiff's private life are not matters of legitimate public concern.

59.  In the book, Defendant LAURA KIPNIS also made false statements about Plaintiff, including misleading misrepresentations that placed her in a negative light.  For example, KIPNIS wrote and caused to be published and Defendant HARPERCOLLINS PUBLISHERS LLC published:

i.  False statements about the nature of Plaintiff's personal and professional relationship with Ludlow, suggesting that it was a consensual dating

13

relationship and that Ludlow was not in a position of evaluative authority with respect to Plaintiff;

ii. The false assertion that Plaintiff initiated six Title IX complaints, including that she initiated a Title IX complaint against "a fellow grad student";

iii. False statements that Plaintiff initiated two Title IX complaints against KIPNIS, as well as a Title IX complaint against KIPNIS's support person;

iv. False statements about the contents of Plaintiff's single Title IX complaint against KIPNIS; and

v. False statements throughout *Unwanted Advances* insinuating that Plaintiff is a liar who fabricated a false claim of rape against Ludlow to seek revenge against him.

60. Although Defendants HARPERCOLLINS PUBLISHERS LLC and LAURA KIPNIS claimed to seek to protect Plaintiff's identity by using a pseudonym, "Nola Hartley," it was obvious to many who Kipnis was writing about. Not only did KIPNIS use the real name of the Northwestern University professor at issue—Peter Ludlow—but she also published many details about Plaintiff's life, including her physical description, thus identifying her within her academic and professional communities.

61. The false light in which Defendants LAURA KIPNIS and HARPERCOLLINS PUBLISHERS LLC placed Plaintiff was highly offensive to her, as it would be to any reasonable person. Defendants branded Plaintiff as a manipulative liar who mischaracterized her relationship with Professor Ludlow for revenge or other ulterior motives.

14

62.     Defendant LAURA KIPNIS wrote *Unwanted Advances*, in part, to retaliate against Plaintiff for her filing of a Title IX complaint against her colleague Ludlow and for her subsequent complaint against KIPNIS.

63.     Defendant LAURA KIPNIS knew that she was violating Plaintiff's privacy, but she did not care.  Indeed, she gloated: "I mean, having been hauled up on complaints once, what do I have to lose? 'Confidentiality'? 'Conduct befitting a professor'? Kiss my ass."

**HarperCollins Publishes and Promotes the Book Without Adequate Investigation**

64.     Before publishing and publicizing the book, Defendants LAURA KIPNIS and HARPERCOLLINS PUBLISHERS LLC did not adequately investigate the truthfulness of KIPNIS's statements about Plaintiff.

65.     Defendant HARPERCOLLINS PUBLISHERS, LLC'S failure to adequately investigate is particularly troubling given that the publishing company had reason to know that Defendant LAURA KIPNIS had had a complaint filed against her by Plaintiff in the past and was angry about being brought up on Title IX charges.  KIPNIS had a clear motive to retaliate.  Moreover, KIPNIS and Ludlow became friends in the course of Plaintiff's Title IX charges against both of them, and KIPNIS was motivated to help Ludlow get back at Plaintiff and provide an alternative theory about his own conduct.

66.     Neither Defendant LAURA KIPNIS nor anyone affiliated with Defendant HARPERCOLLINS PUBLISHERS LLC ever bothered to reach out to Plaintiff to determine the accuracy of the information about her contained in the book.  Nor did Defendants seek Plaintiff's permission to publish highly personal, embarrassing, and

damaging information about her. Moreover, KIPNIS possessed information that contradicted Ludlow's version of events, but chose not to publish that information because it did not fit with her narrative of Ludlow as victim.

67. Defendant LAURA KIPNIS claims that Professor Ludlow gave her access to his private text messages with Plaintiff. Neither KIPNIS nor Defendant HARPERCOLLINS PUBLISHERS LLC sought to determine whether these text messages were authentic, complete, or presented in context. Nor did Defendants seek Plaintiff's permission to publish her private text messages.

**Publication and Promotion of *Unwanted Advances* Has Harmed and Will Continue to Harm Plaintiff**

68. Defendants' book received attention in many respected publications, including *Forbes, The Guardian, Huffington Post, Mother Jones, National Public Radio, National Review, The New York Times, The New Yorker, Oprah.com*, *Publishers Weekly,* and *The Wall Street Journal.*

69. Beyond the mainstream media attention, *Unwanted Advances* has predictably garnered close scrutiny from the relatively small world of academic philosophy.

70. On social media and in various professional blogs, including blogs devoted to covering philosophy, many people—including prominent members of the academic philosophy community where Plaintiff hopes to soon work—have been dissecting *Unwanted Advances,* and publicly identifying Plaintiff by name.

16

71.     Some in Plaintiff's academic and professional community have opined online that, because of *Unwanted Advances*, Plaintiff will never get a job in her field. Others outright threaten to blacklist her. Indeed, because of the publication of *Unwanted Advances* and the firestorm of publicity and gossip that it has generated in her academic field, she has had to put off her entry into the academic job market by at least one and possibly two academic years.

72.     Although Plaintiff requested retractions from Defendants, no retractions have been made.

73.     Further, Defendant LAURA KIPNIS has continued to make false statements about Plaintiff in press interviews about the book, despite receiving written notice from Plaintiff's counsel that the allegations about Plaintiff are false and should be retracted.

## COUNT ONE
### (Public Disclosure of Private Facts)

74.     Paragraphs 1 through 73 of this Complaint are incorporated here.

75.     Defendants published and caused to be published facts concerning Plaintiff's private life. Among the private details of Plaintiff's life that Defendants have made public include the Plaintiff's prior relationship with a married man who taught at a different academic institution; intimate details of Plaintiff's conversations with and relationship with Ludlow; and information contained in confidential University records stemming from the investigation of Plaintiff's sexual harassment and sexual assault complaint against Ludlow.

76.     The matters publicized were highly offensive to a reasonable person.

77. The matters publicized were not of legitimate public concern. Indeed, Defendant LAURA KIPNIS acknowledges in her book that she is aware that universities treat sexual assault charges like those Plaintiff made against Ludlow as confidential.

78. As a result of Defendants' conduct, Plaintiff was harmed and continues to be harmed in that she has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to her education.

## COUNT TWO
### (False Light Invasion of Privacy)

79. Paragraphs 1 through 78 of this Complaint are incorporated here.

80. Defendants' actions in falsely portraying Plaintiff as having lied about a sexual assault allegation, as having given and then retracted consent to sex with Ludlow, and as having filed multiple Title IX complaints, including a prior complaint against a fellow student, placed the Plaintiff in a false light before the public.

81. The false light in which Defendants' conduct placed Plaintiff would be highly offensive to a reasonable person.

82. Defendants acted with actual malice; that is, they acted with knowledge that their statements were false or with reckless disregard for whether the statements were true or false. Indeed, not only did Defendants fail to fact-check their sources, but Defendant LAURA KIPNIS knowingly omitted contrary evidence so that the information disclosed would fit her pre-determined narrative. Defendant HARPERCOLLINS PUBLISHERS, LLC had reason to know that KIPNIS had a motive to retaliate against Plaintiff and that

18

her allegations about Plaintiff needed to be carefully sourced. Nonetheless, HARPERCOLLINS failed to check the allegations about Plaintiff for accuracy.

83. As a result of Defendants' conduct, Plaintiff was harmed and continues to be harmed in that she has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to her education.

## COUNT THREE
### (Defamation)

84. Paragraphs 1 through 83 of the Complaint are incorporated here.

85. Defendants made false statements about the Plaintiff, as summarized by category in paragraph 59. Even though the statements did not use Plaintiff's real name, others besides Plaintiff and Defendants reasonably understood that she was the person described as "Nola Hartley."

86. The statements were defamatory because they harmed Plaintiff's reputation by lowering her in the eyes of the community and deterring the community from associating with her.

87. The false statements were defamatory *per se*, because the harm to Plaintiff's reputation is obvious and apparent on its face. As one example, the parts of *Unwanted Advances* that state and insinuate that Plaintiff manufactured a rape allegation against Ludlow—that she lied about something so important as a way to take revenge on him— are an allegation that Plaintiff engaged in illegal conduct. Moreover, the allegation that Plaintiff filed multiple Title IX complaints including against a fellow student seeks wholly

19

to undermine Plaintiff's reputation in the overall community, and more particularly in the small community of philosophy academia, where being a "serial Title IX filer" (as Defendant LAURA KIPNIS describes Plaintiff) who makes up lies to harm professors is the kiss of death. These statements prejudice Plaintiff in her profession.

88.     Defendants made an unprivileged publication of the statements to third parties.

89.     As a result of Defendants' publication of false statements about Plaintiff, Plaintiff was harmed and continues to be harmed in that she has experienced economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to her education.

## COUNT FOUR
### (Intentional Infliction of Emotional Distress)

90.     Paragraphs 1 through 89 of the Complaint are incorporated here.

91.     Defendants engaged in conduct that constitutes extreme and outrageous conduct. This was not a situation in which Defendants made just one or two false statements that incidentally affected Plaintiff. This was no minor insult or annoyance. Rather, Defendant LAURA KIPNIS wrote and Defendant HARPERCOLLINS PUBLISHERS LLC published an *entire book* that—page after page—exposes extremely private and painful parts of Plaintiff's life, makes false statements about her conduct, brands her a vengeful liar, and turns this promising young graduate student's life upside down for the entire world to see.

92.     Defendants knew that Plaintiff was peculiarly susceptible to emotional distress.  Plaintiff had been through an awful experience, first with Ludlow, then with the entire Title IX debacle.  The very fact that Plaintiff filed a Title IX complaint against Defendant LAURA KIPNIS in 2015, based on the harm Plaintiff experienced when KIPNIS first wrote publicly about Plaintiff in *The Chronicle of Higher Education*, was enough to put Defendants on notice that shining a spotlight on Plaintiff in this context had already and was continuing to harm her.

93.     Making matters even worse, Defendants sought to and did promote the book widely, compounding the harm to Plaintiff.  The wide reach of Defendants' smear campaign against Plaintiff, and its permanence (a published book, along with news articles, blogs, and other Internet commentary that will forever and inexorably remain available to all), contribute further to the extreme and outrageous nature of Defendants' conduct.

94.     Defendants engaged in this extreme and outrageous conduct knowing that there was a high probability, or with reckless disregard of the probability, of causing severe emotional distress to Plaintiff.  Defendant LAURA KIPNIS harbored resentment against Plaintiff for Plaintiff's filing of a Title IX complaint against KIPNIS.  KIPNIS was frustrated and upset with what she described as her "Title IX Inquisition."  She was blatant and unapologetic in *Unwanted Advances* about her lack of regard for the legal requirements of Title IX and whether breaching confidentiality and writing about Plaintiff was legally allowed and would cause harm.  Moreover, neither KIPNIS nor HARPERCOLLINS PUBLISHERS LLC reached out at all to Plaintiff before proceeding with the book, either to check facts or to determine whether proceeding would harm Plaintiff.

21

95.     Defendants' conduct caused severe emotional distress to Plaintiff.   No reasonable person could be expected to endure being made the focal point of a campaign by a professor at her own University not only to discredit schools' Title IX policies and procedures, but also to discredit the student herself in her own academic community and far beyond.  Plaintiff's emotional distress has been compounded by the fact that this was not a one-time, isolated incident, but rather the creation and publication of something that will endure forever, both as a book and in the many discussions of the book that are now on the Internet.

96.     As a direct and proximate result of Defendants' conduct, Plaintiff was harmed and continues to be harmed in that she has experienced economic and non-economic damages, including severe emotional distress and mental anguish, harm to reputation, harm to career, and harm to her education.

WHEREFORE, Plaintiff requests judgment in her favor and against Defendants, as follows:

      a.  Compensatory damages;

      b.  Punitive damages;

      c.  Attorney's fees, costs, and expenses;

      d.  Prejudgment interest; and

      e.  To grant further relief as this Court should find just and proper.

Dated:  May 16, 2017    By:    s/ Jennifer B. Salvatore and Julie B. Porter
                               SALVATORE PRESCOTT & PORTER

                               Jennifer B. Salvatore      Julie B. Porter
                               105 E. Main Street         1010 Davis Street
                               Northville, MI 48167       Evanston, IL 60201
                               (248) 679-8711             (312) 283-5711
                               salvatore@spplawyers.com porter@spplawyers.com

## DEMAND FOR JURY TRIAL

NOW COMES Plaintiff, JANE DOE, by and through her attorneys, SALVATORE

PRESCOTT & PORTER, PLLC, and hereby demands a jury trial in the above-captioned

matter.

Dated:  May 16, 2017    By:    s/ Jennifer B. Salvatore and Julie B. Porter
                               SALVATORE PRESCOTT & PORTER

                               Jennifer B. Salvatore      Julie B. Porter
                               105 E. Main Street         1010 Davis Street
                               Northville, MI 48167       Evanston, IL 60201
                               (248) 679-8711             (312) 283-5711
                               salvatore@spplawyers.com porter@spplawyers.com