**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JANE DOE,

                                                      No. 1:17-cv-03688

        Plaintiff,                                Hon. John Robert Blakey, Judge

v.

HARPERCOLLINS PUBLISHERS LLC and
LAURA KIPNIS,

        Defendants.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

STATEMENT OF FACTS ................................................................................................. 1

STANDARD OF REVIEW ............................................................................................... 7

ARGUMENT .................................................................................................................... 7

I. Plaintiff Properly Pleads Defamation ............................................................ 7

    A.    Plaintiff Pleads Defamatory Statements with
            Precision and Particularity ........................................................... 7

    B.    Kipnis's Defamatory Statements are Not "Opinions" .................. 9

    C.    Kipnis's Words Clearly Intended and Conveyed Defamatory Meaning ... 11

    D.    Plaintiff Pleads Malice ............................................................... 12

II. Plaintiff States a Claim for Publication of Private Facts ............................... 14

III. Plaintiff States a False Light Claim ............................................................. 19

IV. Plaintiff States a Claim for Intentional Infliction of Emotional Distress ................... 19

CONCLUSION ................................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Anderson v. Suitors,*
    499 F.3d 1228, 1236 (10th Cir. 2007)……………………………………………………17

*Bittman v. Fox,*
    107 F.Supp.3d 896, 902 (N.D. Ill. 2015)…………………………………….……………..9

*Bryson v. News America Pub. Inc.,*
    672 N.E.2d 1207, 1220 (Ill. 1996)……………………………………………….......10-12

*Cinel v. Connik,*
    15 F.3d 1338, 1346 (5th Cir. 1994)…………………………………………………………17

*Coplin v. Fairfield Pub. Access Television Comm.,*
    111 F.3d 1395, 1405 (8th Cir. 1997)…………………………………………….…………18

*The Florida Star v. BJF*
    491 U.S. 524, 530 (1989)………………………………………………...............………..18

*Green v. Chicago Trib. Co.,*
    675 N.E.2d 249, 253, 256-57 (Ill. Ct. App. 1996)...............................................14, 16, 19

*Green v. Rogers,*
    917 N.E.2d. 450, 459, 463 (Ill. 2009) ...........................................................................9, 11

*Harte-Hanks Comm., Inc. v. Connaughton,*
    491 U.S. 657, 692 (1989)....................................................................................... 13-14

*Haynes v. Alfred A. Knopf, Inc.,*
    8 F.3d 1222 (7th Cir. 1993) .............................................................................. 17-18

*Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cty*
    804 F.3d 826,832-33  (7th Cir. 2015) ..................................................................7

*Kapotas v. Better Gov't Ass'n,*
    30 N.E.3d 572, 597 (Ill. Ct. App. 2015) .........................................................18

*Ludlow v. Northwestern. Univ.,*
    1:14-cv-4614, Dckt Nos. 1, 69 (N.D. Ill. June 18, 2014) ...................................5

*Milkovich v. Lorain Journal Co.,*
    497 U.S. 1, 11 (1990)...........................................................................7, 9, 10

*Rosenblatt v. Baer,*
    383 U.S. 75, 92 (1966)..................................................................................1, 7

*Ross v. Midwest Comm.,*
    870 F.2d 271, 274 (5th Cir. 1989) ....................................................................17

*St. Amant v. Thompson,*
    390 U.S. 727, 732 (1968)..................................................................................13

*Swanson v. Citibank, N.A.,*
    614 F.3d 400, 404 (7th Cir. 2010) ......................................................................7

*The Florida Star v. BJF,*
    491 U.S. 524, 630 (1989)..................................................................................18

*Thomas v. Pearl,*
    998 F.2d 447, 452 (7th Cir. 1993) ....................................................................17

*Walls v. Lombard Police Officers Jerome,*
    No. 99 C 3016, 2000 WL 631302, *2 (N.D. Ill. 2000 ........................................9

*Wilson v. Formigoni,*
    42 F.3d 1060, 1062 (7th Cir. 1994) ....................................................................7

*Wolfe v. Schaefer,*
    619 F.3d 782, 784 (7th Cir. 2010) ............................................................. 17-18

## <u>Statutes</u>

Fed. R. Civ. P. 8(a)(2)...........................................................................................7

"*The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty.*" Justice Potter Stewart, *Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966).

Plaintiff Jane Doe, a graduate student, brought a complaint for, among other things, defamation and invasion of privacy after Defendants Laura Kipnis and HarperCollins Publishers published a book that, through falsehoods, innuendo, and the exposure of private facts, publicly maligned Plaintiff's character. The Court should deny Defendants' motion to dismiss because Defendants defamed Plaintiff, Plaintiff's private information was not a matter of public record or public concern, and Defendants' outrageous conduct caused and continues to cause Plaintiff severe emotional distress.

## STATEMENT OF FACTS

### Plaintiff Meets Northwestern Philosophy Professor Peter Ludlow

Plaintiff is a female graduate student who, in 2011, applied to Northwestern University's top-ranked doctoral program in Philosophy. ECF No. 1 at ¶¶ 10-11. Peter Ludlow is a nationally prominent philosopher and then-Northwestern professor. *Id.* at ¶¶ 12, 14-15. Defendant Laura Kipnis is Ludlow's former colleague, friend, and champion, and author of the defamatory book, *Unwanted Advances: Sexual Paranoia Comes to Campus. Id.* at ¶¶ 1-2.

In 2011, before enrolling at Northwestern, Plaintiff attended a recruitment event at Ludlow's home. ECF No. 1 at ¶¶ 12-13. Although other prospective graduate students also attended, Ludlow, who was in his fifties, focused his attention virtually exclusively on the then-24-year-old Plaintiff. *Id.* at ¶ 13. Ludlow took Plaintiff into his bedroom, showed her copies of his unpublished works in progress, beseeched her to come to Northwestern because she "had to work with him," and suggested that he could help her, including to obtain an invitation to a prestigious philosophy conference in Scotland later that summer. *Id.* at ¶ 14. Moved by the opportunity to be

1

mentored by Ludlow, an influential professor and leader within the field of philosophy, Plaintiff decided to attend Northwestern. *Id*. at ¶ 15. Plaintiff declined the summer conference opportunity, however, when she rejected Ludlow's attendant invitation to spend the summer with him in a Scottish rental home (which he said he would pay for with his research funds). *Id*. at ¶¶ 16-18.

**Ludlow Becomes a Controlling, Central Figure in Plaintiff's Life**

At Northwestern, Ludlow decided to attend and participate in a seminar in which Plaintiff was enrolled. *Id*. at ¶ 20. He asked her to co-author a paper with him, invited her out for meals, and communicated with her daily. *Id*. at ¶ 21. Ludlow pursued opportunities to meet with Plaintiff alone, including inviting Plaintiff to his apartment. *Id*. at ¶ 23. Ludlow also engaged Plaintiff in discussions about his personal life, confiding in her about his romantic relationships and asking her advice about the many younger women he dated. *Id*. at ¶ 23. Ludlow quickly became a dominant and central figure in Plaintiff's life at Northwestern. *Id*. at ¶ 22.

Ludlow also aggressively pursued a romantic relationship with Plaintiff. *Id*. at ¶ 27. Plaintiff, who was increasingly isolated from her colleagues by virtue of Ludlow's demands on her time, wanted to maintain an academic and intellectual relationship with Ludlow. He had considerable influence and evaluative authority over Plaintiff as her mentor, professor, and primary author on the academic paper they were co-authoring. *Id*. at ¶ 27. Plaintiff did not want a romantic relationship with Ludlow and was already in a long-distance relationship with another man. *Id*. at ¶¶ 26-27. Ludlow, however, kissed Plaintiff and remarked that she had "to decide what kind of relationship [they] have." *Id*. at ¶ 25. Ludlow's efforts to persuade Plaintiff to romantically engage him continued unabated, with Plaintiff making some concessions to Ludlow's pressure while clearly maintaining that she would not have sex with him. *Id*. at ¶¶ 27, 29.

2

Ludlow wanted more intimacy and control. *Id*. at ¶¶ 28-30. In one instance, he became enraged when Plaintiff told him she was going to switch a paper topic. *Id*. at ¶ 28. Yelling at her and driving erratically, he screamed, "We. Had. A. PLAN." *Id*. In addition, Ludlow complained that Plaintiff was not paying him enough attention. *Id*. at ¶ 30. When Plaintiff's boyfriend visited, Ludlow became angry and jealous. *Id*.

One evening, Plaintiff had drinks with Ludlow and became intoxicated. *Id*. at ¶ 31. The following morning, Plaintiff awoke in Ludlow's bed naked and could tell she had had sexual intercourse, although she had no memory of what had happened. *Id*. Devastated and upset, but nonetheless aware of Ludlow's continued position as her professor and mentor, Plaintiff did not know what to do. She attempted to maintain a sense of normalcy and, as soon as possible thereafter, she left the campus for holiday break. *Id*. at ¶ 32.

**Plaintiff Terminates Her Relationship with Ludlow**

Being away from Ludlow, Plaintiff better understood the power dynamics in their dysfunctional relationship, one in which Ludlow exercised undue control within their now entwined personal and academic lives. *Id*. Plaintiff ended the relationship with Ludlow, discontinued her work on the paper they were co-authoring, and took an incomplete in a philosophy course in Ludlow's discipline. *Id*. at ¶¶ 33-35. Unable successfully to complete her coursework because of the emotional strain resulting from what had transpired with Ludlow, Plaintiff failed to meet the program's annual goals. *Id*. at ¶ 35.

**Plaintiff Declines to Participate in First Title IX Action against Ludlow**

Although Plaintiff terminated her relationship with Ludlow, she was unable to escape its wake. In a matter in which Plaintiff was uninvolved, a first-year undergraduate student filed a complaint against Ludlow for sexual misconduct. *Id*. at ¶ 36. Northwestern's Title IX coordinator

sought the names of people to whom she should speak about Ludlow. *Id*. When Plaintiff's name surfaced, the coordinator met with Plaintiff. But Plaintiff, who feared the repercussions of reporting Ludlow, declined to "go on the record" about her own experiences. *Id*. at ¶ 37. Plaintiff again declined to participate in the investigation when the Title IX office contacted her a second time. *Id*. at ¶ 38. The investigation against Ludlow for sexual misconduct against the undergraduate student continued without Plaintiff's participation, ultimately resulting in Ludlow being disciplined. *Id*. at ¶ 40.

Plaintiff, who lacked a confidante with whom she could comfortably share the details of her experience, labored for the next year under the mental and emotional weight of her troubling experience. *Id*. at ¶ 40. She lacked concentration, suffered depression, and some days, had difficulty even getting out of bed. *Id*.

**Plaintiff Reluctantly Files Her Own Title IX Action against Ludlow**

In February 2014, the undergraduate student sued Northwestern for Title IX violations, and that student's allegations of sexual harassment and assault by Ludlow became public. *Id*. at ¶ 41. Plaintiff was uninvolved in filing this lawsuit and was, in fact, out of the country attending an academic conference in Colombia when she first learned about it. *Id*. at ¶ 42. Professor Jennifer Lackey, also at the conference, noticed that Plaintiff was upset and asked if everything was okay, prompting Plaintiff to confide in Lackey some details of her experience with Ludlow. *Id*. Plaintiff did not then disclose Ludlow's sexual assault, but she did do so a short while later. *Id*. at ¶¶ 43, 45.

Upon Plaintiff's return to campus, Lackey informed Plaintiff that she (Lackey) was obliged to report Plaintiff's disclosures to Northwestern, which Lackey ultimately did. *Id*. at ¶¶ 44, 46. Plaintiff, who was afraid but wanted to do the right thing, reluctantly agreed to meet with the Title

IX officer and to make a formal complaint. *Id*. at ¶ 47. Northwestern launched an investigation and hired an outside investigator. The investigator found that Ludlow had sexually harassed Plaintiff. *Id*. at ¶¶ 48-49. The University initiated termination proceedings against Ludlow, during which Ludlow resigned. *Id*. at ¶ 50. Ludlow subsequently sued Plaintiff and Northwestern for a myriad of state and federal claims. The claims against Plaintiff were dismissed on the pleadings pursuant to a 12(b)(6) motion. *Ludlow v. Northwestern. Univ*., 1:14-cv-4614, ECF Nos. 1, 69 (N.D. Ill. June 18, 2014).

**Kipnis Targets and Defames Plaintiff**

In or around February 2015, following the dismissal of Ludlow's lawsuit, Defendant Laura Kipnis — a Northwestern professor who had served as Ludlow's support person during his termination hearing — published the article "Sexual Paranoia Strikes Academe." ECF No. 1 at ¶ 51. Fueled by apparent animus toward Plaintiff for filing a complaint against Ludlow, Kipnis in her article made false claims about Plaintiff. *Id*. at ¶ 52. Plaintiff then filed a Title IX retaliation complaint against Kipnis because of those misrepresentations and omissions. *Id*. at ¶ 53. The retaliation complaint prompted Kipnis to write a second article, "My Title IX Inquisition," in which she further attacked Plaintiff and bemoaned the deficiencies of the University's Title IX process and the people charged with executing its mandates. *Id*. Kipnis later expanded on these articles in the book at issue, *Unwanted Advances*, which Defendant HarperCollins published on or about April 4, 2017. *Id*. at ¶ 54.

**The Book**

In the book, Kipnis critiques the manner in which colleges and universities have implemented Title IX, including the alleged victim-centered orientation of such procedures, and the consequent female helplessness that she believes permeates college campuses. To provide

5

context for her critique, Kipnis appropriates Plaintiff and her life experiences, weaving a cautionary tale about an innocent professor (Ludlow) who fell prey to a dishonest and unscrupulous student (Plaintiff). Kipnis, using a thinly-veiled pseudonym, discusses Plaintiff throughout the book, including devoting an entire chapter (one of only five total chapters) to Plaintiff. *Id*. at ¶ 56.

Before publishing *Unwanted Advances*, Defendants exhibited no interest in confirming the veracity of statements made about Plaintiff. *Id*. at ¶ 64. No one talked to Plaintiff nor even attempted to do so. *Id*. at ¶ 66. No one sought permission to publish Plaintiff's private information. *Id*. at ¶ 66. No one sought to authenticate Plaintiff's text messages — which Kipnis published. *Id*. at ¶ 67. And information available to Defendants that contradicted Ludlow's account was ignored. *Id*. at ¶ 66.[1]

*Unwanted Advances* received prominent media attention, including in the *New York Times, Oprah.com,* and *The Wall Street Journal*. *Id*. at ¶ 68. As Plaintiff feared, online commentators discussing *Unwanted Advances* identified Plaintiff by name. *Id*. at ¶ 70. Many opined that Plaintiff will never get a job in academia because of her portrayal in *Unwanted Advances*. *Id*. Others outright demanded that she be blacklisted. *Id*. at ¶ 71. With her career hanging in the balance, and given the existing firestorm regarding her suitability for employment that *Unwanted Advances* generated, Plaintiff has delayed entry into the academic job market. *Id*.

---

[1] Defendants' failure to conduct basic fact-checking of this book extended beyond Plaintiff to numerous other individuals who were also falsely portrayed and with whom Defendants did not bother to speak. Discovery in this case will further develop this evidence.

**STANDARD OF REVIEW**

In considering a motion to dismiss under Rule 12(b)(6), the Court must accept the complaint's factual allegations as true. *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir. 1994). The complaint need only contain a short and plain statement that is plausible on its face and shows that the pleader is entitled to relief. *Huri v. Office of the Chief Judge of the Cir. Ct. of Cook Cty*, 804 F.3d 826,832-33 (7th Cir. 2015), citing Fed. R. Civ. P. 8(a)(2); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). "Plausibility does not mean probability: a court reviewing a 12(b)(6) motion must 'ask itself *could* these things have happened, not *did* they happen.'" *Id.*, quoting *Swanson*, 614 F.3d at 404 (emphasis in original). "The standard simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence supporting the allegations." *Id.* at 833.

**ARGUMENT**

**I.     Plaintiff Properly Pleads Defamation**

"Since the latter half of the 16th century, the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 11 (1990). Our body of law recognizes the "important social values which underlie the law of defamation" and recognizes that "[s]ociety has a pervasive and strong interest in preventing and redressing attacks upon reputation." *Id.* at 22, quoting *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). Here, Plaintiff, who has been publicly maligned by Defendants' defamatory conduct, seeks redress for the attack upon her character and reputation.

**A.  Plaintiff Pleads Defamatory Statements with Precision and Particularity**

Plaintiff pleads defamation with precision and particularity, stating:

1. In April of 2017, HarperCollins Publishers LLC published a book written by Northwestern ("NU") professor Laura Kipnis entitled *Unwanted Advances: Sexual Paranoia Comes to Campus*.

***

59. In the book, Defendant Laura Kipnis made false statements about Plaintiff, including misleading misrepresentations that placed her in a negative light. For example …:

i. False statements about the nature of Plaintiff's personal and professional relationship with Ludlow, suggesting that it was a consensual dating relationship and that Ludlow was not in a position of evaluative authority with respect to Plaintiff;

ii. The false assertion that Plaintiff initiated six Title IX complaints, including that she initiated a Title IX complaint against 'a fellow grad student";

iii. False statements that Plaintiff initiated two Title IX complaints against Kipnis, as well as a Title IX complaint against Kipnis's support person;

iv. False statements about the contents of Plaintiff's single Title IX complaint against Kipnis; and

v. False statements throughout *Unwanted Advances* insinuating that Plaintiff is a liar who fabricated a false claim of rape against Ludlow to seek revenge against him.

(ECF No. 1 at ¶¶1, 59, 87).

[T]he parts of *Unwanted Advances* that state and insinuate that Plaintiff manufactured a rape allegation against Ludlow – that she lied about something so important as a way to take revenge on him – are an allegation that Plaintiff engaged in illegal conduct. Moreover, the allegation that Plaintiff filed multiple Title IX complaints against a student seeks wholly to undermine Plaintiff's reputation in the overall community, and more particularly in the small community of philosophy academia, where being a "serial title IX filer" (as Defendant Kipnis describes Plaintiff) who makes up lies to harm professors is the kiss of death.

Plaintiff states the **who** (Defendants, *id*. at ¶¶ 1, 59), the **where** (*Unwanted Advances*, *id*. at ¶¶ 1, 59), the **when** (published in April 2017, *id*. at ¶ 1), the **what** (including false statements regarding the consensual nature of Plaintiff's relationship, disclaiming Ludlow's evaluative authority over Plaintiff, the number of Title IX complaints that Plaintiff filed, insinuating that

Plaintiff fabricated a claim of rape, and insinuating that she did so in pursuit of revenge, *id.* at ¶¶ 59, 87). Plaintiff also pleads the *why*, as discussed further below.

Defendants urge the Court to dismiss Plaintiff's defamation claim because she did not recite the "specific words complained of." But neither Illinois nor the federal courts applying Illinois defamation law require Plaintiff to plead *per se* defamatory statements verbatim; rather, "the *substance* of the statement must be pled with sufficient precision and particularity so as to permit initial judicial review of its defamatory content." *Green v. Rogers*, 917 N.E.2d 450, 459 (Ill. 2009) ("Although a complaint for defamation *per se* need not set forth the allegedly defamatory words *in haec verba*, the substance of the statement must be pled with sufficient precision and particularity …"); *see also Bittman v. Fox*, 107 F.Supp.3d 896, 902 (N.D. Ill. 2015) ("[Plaintiff] is not required to recite the alleged defamatory statements verbatim, but the substance of any statement must be pleaded with 'sufficient precision and particularity so as to permit judicial review of its defamatory content.'"). Here, Plaintiff's Complaint is sufficiently specific. *See Walls v. Lombard Police Officers Jerome*, No. 99 C 3016, 2000 WL 631302, *2 (N.D. Ill. 2000) (observing that "[W]here 'the substance of the defamatory statements are adequately identified,' plaintiffs have been able to plead less specifically.").

For these reasons, Defendants' motion to dismiss should be denied.[2]

**B. Kipnis's Defamatory Statements Are Not "Opinions"**

"[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words, 'I think.'" *Milkovich,* 497 U.S. at 19, quoting *Ciacni* at 64. Here, amidst the sea of opinions that Kipnis offers in her

---

[2] Plaintiff believes that she properly pleaded defamation. However, if the Court requires more specificity, Plaintiff requests an opportunity to amend her complaint.

book, none of which are the subject of Plaintiff's complaint, Kipnis makes multiple, provably false statements of fact regarding Plaintiff, her activities, and her experiences. Neither Defendants' characterization of these statements as "opinions," nor Kipnis's "loose narrative style" and other literary labels, nullify the book's defamatory content. As observed by the Illinois Supreme Court, there is no "wholesale defamation exemption for anything that might be labeled 'opinion.'" *Bryson v. News America Pub. Inc.*, 672 N.E.2d 1207, 1220 (Ill. 1996), quoting *Milkovich*, 497 U.S. at 18. "[A] false assertion of fact can be libelous even though it is couched in terms of an opinion." *Id.*[3]

With regard to Defendants' argument that Kipnis's defamatory statements are not actionable because "the Book holds itself out as opinion," and is "written in a loose narrative style" that includes "humor" and "sarcasm," literary labels are not dispositive on the issue of whether content is defamatory: "The test is not whether the story is or is not characterized as 'fiction,' or 'humor,' but whether the charged portions, in context, could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated." *Bryson*, 672 N.E.2d at 1220. In this case, Kipnis makes provably false factual statements that she cobbles together to paint a wrong and unflattering portrait of Plaintiff that has caused substantial damage to Plaintiff's reputation and her career prospects. The fact that Kipnis characterizes her text as "opinion," "humor," or otherwise does not matter.

---

[3] As explained by Justice Rehnquist: "If a speaker says, 'In my opinion John Jones is a liar,' he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'" *Milkovich*, 497 U.S. at 18-19.

### C. Kipnis's Words Clearly Intended and Conveyed a Defamatory Meaning

Defendants argue that statements in the book characterizing Plaintiff as a serial Title IX filer are not defamatory because they are subject to an innocent construction. But the innocent-construction rule does not apply here. On this issue, the Illinois Supreme Court "has emphasized that the context of the statement is critical in determining its meaning, as a given statement may convey entirely different meanings when presented in different contexts." *Green*, 917 N.E.2d at 463. "[W]hen the defendant clearly intended and unmistakably conveyed a defamatory meaning, a court should not strain to see an inoffensive gloss on the statement." *Id*.

Here, Kipnis falsely depicts Plaintiff as a serial Title IX filer. She does so in the context of a diatribe against what Kipnis perceives as a culture of "female victimhood" in which Title IX has become a weaponized tool for women to retroactively retract consent and subject innocent men to claims of sexual misconduct. Kipnis bemoans the "sexual paranoia" that "has converted the Title IX bureaucracy into an insatiable behemoth, bloated by its own federal power grab.…" *Unwanted Advances* at 5. She protests the "astonishing netherworld of accused professors and students, rigged investigations, closed-door hearings, and Title IX officers run amok." *Id*. at 6. And in chapters with illustrative titles such as, "The Accusation Factory," "Flip-Flopping on Consent," and "My Title IX Inquisition," Kipnis attacks Title IX complainants, including Plaintiff, suggesting promiscuity ("Given this tangle of men, triangulations, and betrayals, it wouldn't be surprising if identities, culpabilities, and antagonisms occasionally spilled into one another."); attacking Plaintiff's intelligence and character ("Having been taken up by a trio of feminist advisors hadn't done her much good – to the contrary, it seems to have transformed her into either a not very bright child, or a chronic dissembler."); and accusing her of fabricating a retaliatory rape allegation ("[D]id [Plaintiff] hate Ludlow enough to take revenge? A false or pumped up rape

accusation would definitely do the trick – even if provable, it would be a career ender.") *Id*. at 113, 125, 237. It is within this context that Kipnis falsely depicts Plaintiff as a serial Title IX complainant. *Id*. at 123.

Given this context, Defendants' claim that Kipnis's false statements regarding the number and nature of Plaintiff's Title IX complaints "is subject to the reasonable, innocent interpretation that Plaintiff … has stood up for herself … and [is] advancing the goals that she publicly embraced …" is preposterous. Courts must "interpret the allegedly defamatory words as they appeared to have been used and according to the idea they were intended to convey to the reasonable reader." *Bryson*, 672 N.E.2d at 1217. Here, Kipnis clearly intended her characterization of Plaintiff as a serial complainant, supported with false facts, to be disparaging. This intent is evident not only from the obvious context of the book, but from Kipnis's own words, in which she says: "Serial charge-bringing is a dangerous proclivity for others in their immediate vicinity." *Unwanted Advances* at 124.

Defendants ask the Court to ignore the obvious defamatory import and intent of Kipnis's statement that Plaintiff is a serial Title IX filer and to strain itself to find an innocent and unintended meaning. When, as here, a defamatory meaning was clearly intended, courts should not "strain to find an unnatural but possibly innocent meaning for words …" *Bryson*, 672 N.E.2d at 1217 (also stating, "When a defamatory meaning was clearly intended and conveyed, this court will not strain to interpret allegedly defamatory words in their mildest and most inoffensive sense in order to hold them nonlibelous under the innocent construction rule.").

### D. Plaintiff Pleads Malice

Plaintiff pleads actual malice, describing in detail that: (1) Defendants had reason to know the book's portrayal of Plaintiff was false; (2) the book was fueled by Kipnis's retaliatory motive;

and (3) Defendants did not adequately investigate the book's factual assertions. ECF No. 1 at ¶¶ 3, 62, 64-65, 82. Defendants' motion to dismiss the defamation claims for failure to plead actual malice should be denied.

First, retaliatory motive is evidence of actual malice. *Mauvais-Jarvis v. Wong*, 987 N.E.2d 864, 893 (Ill. Ct. App. 2013) (finding that defamatory statements in "retaliation" and "reprisal" against Plaintiff showed malice). Here, Plaintiff clearly pleads that Kipnis defamed her in retaliation for Plaintiff's Title IX complaints against Kipnis and Ludlow. ECF No. 1 at ¶¶ 62, 65, 82. Defendants do not address this issue at all.

Second, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Again, Plaintiff plainly pleads that HarperCollins had obvious reasons to doubt the veracity of Kipnis's statements about Plaintiff, stating "HarperCollins published false and damaging statements about Plaintiff … despite having reason to know that this portrayal was false;" "the publishing company had reason to know that Defendant Laura Kipnis had had a complaint filed against her by Plaintiff in the past and was angry about being brought up on Title IX charges;" and HarperCollins "had reason to know that Kipnis had a motive to retaliate against Plaintiff and that her allegations about Plaintiff needed to be carefully sourced," yet the publishing company failed to do so. ECF No. 1 at ¶¶ 3, 65, 82. Defendants also do not address this issue.

Third, "[a]lthough failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of truth is a different category." *Harte-Hanks Comm., Inc. v. Connaughton*, 491 U.S. 657, 692 (1989). Here, Plaintiff pleads that Defendants avoided the truth by never contacting Plaintiff to determine the accuracy of the information about her in the book or to confirm the authenticity of the text messages relied upon. ECF No 1 at ¶¶ 66-67.

Finally, "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Comm,* 491 U.S. at 668. Here, Defendants urge the Court to disregard Kipnis's animosity toward Plaintiff, avoidance of contrary information, and, as to both Defendants, the failure to investigate, arguing that courts have found these individual factors to be insufficient to establish actual malice. However, courts may consider such factors as circumstantial evidence, even if alone they are not enough to establish actual malice. *Id*. at 667-68 (observing that profit-motive and failure to abide by professional standards, factors by themselves enough to show malice, as "supportive of the court's ultimate conclusion" that the record demonstrated actual malice). Here, these factors together, and in conjunction with Kipnis's retaliatory motive and HarperCollins's failure to investigate despite obvious reasons to do so, establish actual malice.

## II. **Plaintiff States a Claim for Publication of Private Facts**

In order to state a cause of action for public disclosure of private facts, a plaintiff must plead that: (1) the defendant gave publicity; (2) to plaintiff's private, not public, life; (3) the matter publicized was highly offensive to a reasonable person; and (4) the matter publicized was not of legitimate public concern. *See Green v. Chicago Trib. Co.*, 675 N.E.2d 249, 253 (Ill. Ct. App. 1996). Defendants do not contest that they published the facts at issue, nor do they dispute that the matter publicized was highly offensive to a reasonable person. Defendants instead argue that the information disclosed was a matter of a public concern, and that the contents of the book were already publicly available. As set forth below, both of those arguments fail.

Plaintiff begins with Defendants' second argument—that the information published in *Unwanted Advances* was already publicly available. Kipnis's own admissions undermine that argument. In the book's Introduction, Kipnis recounts how in 2016—after Ludlow's civil suit

14

ended— she flew to Mexico and met with Ludlow.  She describes how he gave her unfettered and

unconditional access to documents in his files:

> Ludlow's parting wave—he had nothing to lose by that point—was
> bestowing on me the files from his investigation: the Title IX reports
> and thousands of pages of background material. (Bureaucracies
> produce a lot of paper.) It's an unprecedented behind-the-scenes
> view of just how haphazard and, frankly, incompetent the Title IX
> process can be. Reading it was incredibly eye-opening—in fact, a
> lot of what I read was shocking, and I'm not exactly unjaded when
> it comes to institutional power.

*Unwanted Advances* at 32; *see also id.* at 241 ("Ludlow entrusted me with his story with no

conditions"). Kipnis later remarks that she reviewed more than "two thousand discrete messages"

between Ludlow and Plaintiff, and "[t]here may be no better-documented relationship in the

history of humanity. I know all this because I've digested the entirety." *Id.* at 93.

Though Plaintiff does not dispute that some information about her relationship with

Ludlow was already in the public domain as a result of Ludlow's prior lawsuit, Kipnis admits in

her own book that a "trove" of new information "landed in her lap," which she felt had to "see the

light of day." *Id.* at 32-33. The fact that this information was described by Kipnis as

"unprecedented," "eye-opening," and "shocking" to her—someone who had written on the topic

and had the benefit of already reviewing the record from the civil lawsuit—demonstrates that the

information provided by Ludlow was not publicly available. Even more striking, Kipnis did not

care that this information might still be confidential. She goes on to write:

> Still as you've probably gathered, going through a Title IX
> investigation . . . has made me a little mad and possibly a little
> dangerous . . . I mean, having been hauled up on complaints once,
> what do I have to lose? "Confidentiality"? "Conduct befitting a
> professor"? Kiss my ass.

*Unwanted Advances* at 34.

Kipnis's own admissions make clear that Defendants published information about Plaintiff that was not already publicly available, including excerpts of Plaintiff's intimate conversations with Ludlow and sensitive details about their relationship; disclosure of Plaintiff's prior relationship with a married man who taught at a different academic institution; and information contained in confidential University records stemming from the investigation of Plaintiff's sexual harassment and sexual assault complaint against Ludlow. *See* ECF No. 1 at ¶¶ 56-57. Accordingly, Defendants' argument that the information contained in *Unwanted Advances* was already public, and thus not actionable, should be rejected.

Defendants' argument that the information contained in *Unwanted Advances* is not actionable because it is a matter of public concern is similarly unavailing. Plaintiff takes no issue with Kipnis's decision to write about Title IX or sexual assault on college campuses or HarperCollins's decision to publish a book that explores these issues. Those are legitimate matters of public concern. But *Unwanted Advances* goes farther—impermissibly using the most intimate details of Plaintiff's life as fodder, revealing highly personal, never-before-publicized facts that are no one's business. And Kipnis did so as a professor at the institution where Plaintiff is still a student—and despite being fully aware that the University treats student Title IX complaints and the resulting investigation materials as confidential.

The fact that Northwestern treats Title IX investigatory materials as confidential is important because in order to determine what is a matter of legitimate public concern, Illinois courts look to the "customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores." *Green*, 675 N.E.2d at 256. "The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a

reasonable member of the public, with decent standards, would say that he had no concern." *Id.* Defendants crossed that line here.

Defendants rely heavily on *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222 (7th Cir. 1993), to support their contention that this is a matter of public concern. But a close reading of *Haynes* and the other cases cited by Defendants demonstrates precisely why Plaintiff states a claim here. In *Haynes*, plaintiffs alleged that a prominent historical book referred to intimate details of their lives, including sexual conduct. But after reviewing the record in the case—which the parties had developed for summary judgment—the Seventh Circuit Court of Appeals noted that no intimate details about the Plaintiffs' life were in fact revealed. The Court wrote:

> The revelations in the book are not about the intimate details of the Hayneses' life. They are about misconduct, in particular Luther's…. The revelations are about his heavy drinking, his unstable employment, his adultery, his irresponsible and neglectful behavior toward his wife and children. So we must consider cases in which the right of privacy has been invoked as a shield against the revelation of previous misconduct.

*Id.* at 1230.[4]

By contrast, *Unwanted Advances* does not expose such misconduct by Plaintiff. Instead, Defendants simply divulge personal information about Plaintiff—in particular, sensitive information about Plaintiff's sexual life and relationship history—not the kind of information

---

[4] Following the discussion of *Haynes*, Defendants cite several other federal decisions in which the issue of public concern was the misconduct *by the individual featured*. As such, these cases are similarly not controlling here. *See Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) (exposing misconduct by employee of a public university); *Anderson v. Suitors*, 499 F.3d 1228, 1236 (10th Cir. 2007) (revealing that a local attorney may have committed sexual assault against a number of women and the "focus of the news broadcast was on the perpetrator, not the victim"); *Cinel v. Connick*, 15 F.3d 1338, 1346 (5th Cir. 1994) (sexual materials and videotapes were of a legitimate public concern because they related to potential criminal conduct by the plaintiff); *Ross v Midwest Comm.*, 870 F.2d 271, 274 (5th Cir. 1989) (information regarding a pattern of conduct in several cases of rape was a matter of public concern when it might prove the innocence of someone wrongfully convicted).

disclosed in *Haynes* and information that no reasonable member of the public is concerned with. *See also Wolfe v. Schaefer*, 619 F.3d 782, 784 (7th Cir. 2010) (recognizing that public disclosure of facts relating to "sexual proclivities or activities" are central to this cause of action); *Coplin v. Fairfield Pub. Access Television Comm.*, 111 F.3d 1395, 1405 (8th Cir. 1997) ("in most circumstances, holding up the sexual activities of a specific private individual to public ridicule is not a legitimate concern of public interest").

Finally, even if the Court finds some question as to whether this is a matter of public concern, Plaintiff's allegations must be taken as true, and as Defendants' own citations demonstrate, questions regarding public concern and privacy involve fact-based inquiries, which are often inappropriate for resolution on a motion to dismiss. *See, e.g.*, *Haynes*, 8 F.3d at 1233-34; *The Florida Star v. BJF*, 491 U.S. 524, 530 (1989) (recognizing the fact-based inquiry in balancing privacy and the First Amendment). This is not a case like *Kapotas v. Better Gov't Ass'n*, 30 N.E.3d 572, 597 (Ill. Ct. App. 2015), which Defendants incorrectly cite for the proposition that the question of public concern is a threshold question. *Kapotas* involved an orthopedic surgeon who worked for a county hospital and who sued various media organizations that published news articles claiming he had received pay during an unpaid leave of absence. *Id*. In that case, the court found that the articles reported on a matter of important public concern where the Plaintiff admitted in his verified complaint that "public funds were paid in violation of [hospital] policy." *Id*. Thus, the Plaintiff conceded the issue of public concern at an early stage.

Here, Plaintiff's complaint makes no such admission conceding that her internal complaint of sexual harassment against a professor was a legitimate matter of public concern. Plaintiff's *confidential* report of improper conduct by someone in a position of authority is very different than "the receipt of state funding by physicians [which] creates a public interest in the physicians'

18

activities regarding the use of those funds." *Id*. at 597. Indeed, in the *Kapotas* case, the court noted that "Physicians as licensed professionals providing public service at the taxpayers' expense at best have a limited privacy interest in this information, and the physicians' interest is decidedly outweighed by the public's interest…The public's right to know how and for what purposes public funds are spent is a matter of legitimate public concern far outweighing any personal privacy rights of those providers to whom the public funds are disbursed." *Id*. (quoting *Family Life League v. Dep't of Public Aid*, 112 Ill. 2d 449, 457 (1986)). The facts of *Kapotas* are hardly analogous to a University student's privacy interest regarding the details of her internal complaint regarding sexual advances by a professor.

For these reasons, Plaintiff has stated a claim for publication of private facts.

## III.     Plaintiff States a False Light Claim

Defendants' motion to dismiss the false-light claim is premised entirely on their claims that Plaintiff does not state a defamation claim and does not plead actual malice. Because Plaintiff states a defamation claim and pleads actual malice as discussed above, Defendants' motion as to this count should also be denied.

## IV.     Plaintiff States a Claim for Intentional Infliction of Emotional Distress

Plaintiff has stated a claim for intentional infliction of emotional distress, and all three of Defendants' arguments to the contrary are unavailing. First, as set forth above, Defendants' publication of information about Plaintiff is not a matter of public concern. *See, supra,* Section II; *see also Green*, 675 N.E.2d at 257 (reversing dismissal of intentional-infliction claims involving publication of private facts). Second, Plaintiff has alleged and demonstrated actual malice. *See, supra*, Section I. Finally, Plaintiff has alleged that Defendants' actions have caused her severe emotional distress. *See* ECF No. 1 at ¶¶ 94-95.

As set forth in Plaintiffs' Complaint, "No reasonable person could be expected to endure being made the focal point of a campaign by a professor at her own University not only to discredit schools' Title IX policies and procedures, but also to discredit the student herself in her own academic community and far beyond." *Id.* at ¶95. Plaintiff's emotional distress has been compounded by the fact that this was "not a one-time, isolated incident, but rather the creation and publication of something that will endure forever, both as a book and in the many discussions of the book that are now on the Internet." *Id.* Accordingly, Defendants' motion to dismiss Plaintiff's claim for intentional infliction of emotional distress should be denied.

## <u>CONCLUSION</u>

For the reasons above, Defendants' motion to dismiss should be denied.

Respectfully submitted,

By:    s/ Jennifer B. Salvatore
       SALVATORE PRESCOTT & PORTER, PLLC
Dated:  August 21, 2017       Jennifer B. Salvatore
       105 E. Main Street
       Northville, MI 48167
       (248) 679-8711
       salvatore@spplawyers.com

       Julie B. Porter
       1010 Davis Street
       Evanston, IL 60201
       (312) 283-5711
       porter@spplawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 21, 2017, I electronically filed the foregoing with the Clerk of the Court for the Northern District of Illinois by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<i><u>s/ Jennifer B. Salvatore</u></i>