## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JANE DOE,

        Plaintiff,

        v.

HARPERCOLLINS PUBLISHERS,
LLC, and LAURA KIPNIS,

        Defendants.

Case No. 17-cv-3688

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Plaintiff, proceeding anonymously, sued the author and publisher of a book entitled "*Unwanted Advances: Sexual Paranoia Comes to Campus*" (sometimes referred to as the Book). In her complaint, Plaintiff alleges public disclosure of private facts (count one); false light invasion of privacy (count two); defamation (count three); and intentional infliction of emotional distress (count four). Defendants Laura Kipnis and HarperCollins Publishers moved to dismiss all claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim [24]. For the reasons explained below, this Court denies Defendants' motion.

I.    Factual Background

In early 2014, Plaintiff, a Ph.D. candidate in Northwestern University's Department of Philosophy, filed a Title IX complaint against one of the professors in the department, Peter Ludlow. Complaint [1] ¶¶ 46–47. Northwestern hired an outside investigator who ultimately concluded that Ludlow had engaged in sexual harassment. *Id.* ¶¶ 48–49. Northwestern commenced a termination hearing

against Ludlow, who resigned amidst the hearing. *Id.* ¶ 50. Ludlow later sued Northwestern and several other individuals, including Plaintiff, and the court dismissed both his complaint and his amended complaint. *See Ludlow v. Northwestern Univ.*, et al., 79 F.Supp.3d 824 (N.D .Ill. 2015) ("*Ludlow I*"); *Ludlow v. Nw. Univ.*, 125 F.Supp.3d 783, 787 (N.D. Ill. 2015) ("*Ludlow II*").

In February 2015, Northwestern University professor Laura Kipnis, Ludlow's friend and colleague, wrote and published an article entitled "Sexual Paranoia Strikes Academe" in *The Chronicle of Higher Education*. [1] ¶ 51. Plaintiff alleges that this article made false claims about her and misrepresented certain facts about Plaintiff's Title IX complaint. *Id.* ¶ 52; Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss [31] at 5. Plaintiff responded by filing a Title IX retaliation complaint against Kipnis based upon those alleged misrepresentations. [1] ¶ 51. Kipnis in turn published a second article in *The Chronicle of Higher Education* titled "My Title IX Inquisition," and she later expanded on these two articles in the book at issue in this lawsuit, "*Unwanted Advances: Sexual Paranoia Comes to Campus.*" Complaint [1] ¶¶ 1, 53. The Book "critiques the Title IX processes under which colleges investigate sexual discrimination complaints" and "gives significant prominence to sexual assault and sexual harassment allegations" made by Plaintiff against Ludlow. *Id.* ¶ 2. *Unwanted Advances* was published by HarperCollins Publishers LLC in April 2017. *Id.* ¶ 54.[1]

---

[1] Though not attached to the Complaint, the Book is referenced throughout. As a result, the Court may properly consider it at this stage. *E.g., Amin Ijbara Equity Corp. v. Vill. of Oak Lawn*, 860 F.3d 489, 493 (7th Cir. 2017) (When ruling on a motion to dismiss, the court may consider documents

According to Plaintiff, the Book defends Ludlow and attempts to recast him as the victim by disclosing private text messages and information about Plaintiff that Kipnis obtained from Ludlow and from otherwise confidential Northwestern University records. *Id.* Plaintiff alleges that the Book discloses "private details about the Plaintiff's personal life" while making "false and damaging statements about Plaintiff and present[s] her in a false light as lying, manipulative, and litigious, despite having reason to know that this portrayal was false." *Id.* ¶ 3. In the Book, Kipnis discusses Plaintiff using a thinly-veiled pseudonym; yet, Plaintiff alleges, because Kipnis used Ludlow's real name and published "many details about Plaintiff's life, including her physical description," the Book made Plaintiff's true identify "obvious to many"−particularly members of the small world of academic philosophy. *Id.* ¶¶ 60, 69.

In the Book, Kipnis discusses Plaintiff at length, devoting one of the Book's five chapters to Plaintiff. *Id.* ¶ 56. Plaintiff alleges that the Book contains far more detail about Plaintiff's personal life regarding her relationship with Ludlow than the "bits and pieces" that had previously "trickled out through Ludlow's lawsuit" against Northwestern University, and it included "embarrassing and sensitive facts never previously in the public domain. *Id.* ¶ 57. Plaintiff alleges that before publishing *Unwanted Advances*, Defendants did not "reach out to Plaintiff to determine the accuracy of the information contained about her in the book." *Id.* ¶

---

attached to the complaint, documents, central to the complaint and to which the complaint refers, and information properly subject to judicial notice).

66.  Nor did Defendants "seek Plaintiff's permission to publish" the information about her.  *Id.*

II.    <u>The Allegations of Plaintiff's Complaint</u>

Plaintiff concedes, as she must, that Defendants have a constitutional right to write and publish on the topic of how modern college campuses implement Title IX and to criticize the procedures colleges employ in investigating Title IX complaints.  She alleges that they do not, however, have the right to disclose and publish "wholly gratuitous private facts about Plaintiff's personal life–facts never before publicized and facts that Plaintiff did not want publicized."  [1] ¶ 56.  In particular, Plaintiff alleges that Kipnis wrote and HarperCollins published the following:

- Facts concerning an alleged sexual relationship between Plaintiff and a married man who teaches at another academic institution, someone Kipnis refers to in the book as "Professor X";

- Personal details about Plaintiff's relationship with Ludlow never before made public;

- Private text messages between Plaintiff and Ludlow, many of which were printed out of context and written about in a misleading manner; and

- Excerpts from Northwestern University Title IX investigation records that the University must treat as confidential pursuant to federal law.

*Id.* ¶ 56.  Plaintiff alleges that these personal facts "are not matters of legitimate public concern."  *Id.* ¶ 58.

Plaintiff further alleges that Kipnis wrote "false statements about Plaintiff, including misleading misrepresentations that placed her in a negative light." *Id.* ¶ 59. In particular, Plaintiff alleges that Kipnis wrote and HarperCollins published:

- False statements about the nature of Plaintiff's personal and professional relationship with Ludlow, suggesting that it was a consensual dating relationship and that Ludlow was not in a position of evaluative authority with respect to Plaintiff;

- False statements that Plaintiff initiated six Title IX complaints, including that she initiated a Title IX complaint against 'a fellow grad student;

- False statements that Plaintiff initiated two Title IX complaints against Kipnis, as well as a Title IX complaint against Kipnis' support person;

- False statements about the contents of Plaintiff's single Title IX complaint against Kipnis; and

- False statements throughout *Unwanted Advances* insinuating that Plaintiff is a liar who fabricated a false claim of rape against Ludlow to seek revenge against him.

*Id.* ¶ 59.

Plaintiff alleges that Kipnis wrote the Book in retaliation for Plaintiff filing Title IX complaints against Kipnis and Ludlow. *Id.* ¶¶ 51–52, 62. Kipnis allegedly "knew she was violating Plaintiff's privacy, but she did not care." *Id.* ¶ 63. Plaintiff alleges that Defendants failed to adequately investigate the truthfulness of Kipnis' statements and also deliberately omitted publication of other information in Kipnis' possession that "contradicted Ludlow's version of events." *Id.* ¶¶ 64–66. Plaintiff alleges that Defendants made no effort to determine whether the information Ludlow supplied to Kipnis, including private text messages, was "authentic,

complete, or presented in context"; nor did they "seek Plaintiff's permission to publish her private text messages." *Id.* ¶ 67.

Plaintiff alleges that, in the Book, Kipnis also details and describes otherwise confidential Northwestern Title IX investigative records, not caring that her publication of such matters violated confidentiality provisions. *Id.* ¶ 63. Indeed, Plaintiff notes, in the Book's introduction, Kipnis cavalierly admits as much:

> Still, as you've probably gathered, going through a Title IX investigation . . . has made me a little mad and possibly a little dangerous: transformed from a harmless ironist into an aspiring whistleblower . . . . It's just these sorts of unintended consequences that a more *psychologically* shrewd band of zealots could have predicted. I mean, having been hauled up on complaints once, what do I have to lose? "Confidentiality"? "Conduct befitting a professor"? Kiss my ass.

Book at 34. Plaintiff alleges that HarperCollins "had reason to know" about Plaintiff's complaint against Kipnis and, therefore, knew or should have known that Kipnis had a motive to retaliate against Plaintiff. [1] ¶ 65.

Plaintiff says that *Unwanted Advances* achieved widespread attention in respected publications, newspapers, journals, social media, professional blogs, and, importantly, garnered close scrutiny from "the relatively small world of academic philosophy." *Id.* ¶¶ 68–70. Plaintiff requested retractions from Defendants, who made none. *Id.* ¶ 72. Instead, Plaintiff alleges, Kipnis has continued to make false statements about Plaintiff in press interviews about the Book despite the retraction request. *Id.* ¶ 73. Plaintiff claims that she may be severely inhibited from employment in academic philosophy—some of her peers threatened to blacklist her

entirely—and that she put off her entry into the field's job market by at least one academic year. *Id.* ¶ 71.

I.    <u>Legal Standard</u>

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so defendants have "fair notice" of the claim "and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conly v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). This plausibility standard "asks for more than a sheer possibility" that a defendant acted unlawfully. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Vill. Of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating a complaint, this Court accepts all well-pled allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

II.   Discussion & Analysis

Defendants have moved to dismiss all four of Plaintiff's claims. The Court discusses each claim in turn.

A.   Plaintiff's Claim for Public Disclosure of Private Facts (Count One)

In count one, Plaintiff alleges that Defendants published and caused to be published intensely private facts, including:

- Facts concerning an alleged sexual relationship between Plaintiff and a married man who teaches at another academic institution, someone Kipnis refers to in the book as "Professor X";

- Personal details about Plaintiff's relationship with Ludlow never before made public;

- Private text messages between Plaintiff and Ludlow, many of which were printed out of context and written about in a misleading manner; and

- Excerpts from Northwestern University Title IX investigation records that the University must treat as confidential pursuant to federal law.

[1] ¶ 56. Plaintiff alleges that these previously private matters were not of legitimate public concern, would be "highly offensive to a reasonable person," and caused an ongoing harm which continues to result in economic and non-economic damages. *Id.* ¶¶ 76–78.

Under Illinois law, to prevail on a claim for unlawful public disclosure of private facts, Plaintiffs must prove: "(1) that Defendant gave publicity; (2) to her private, not public, life; (3) that the matter publicized was highly offensive to a reasonable person; and (4) that the matter published was not of legitimate public concern." *Doe v. TCF Bank Illinois, FSB*, 707 N.E.2d 220, 221 (Ill. App. Ct. 1999).

This type of claim must be based upon *true* facts, and the Supreme Court has been careful not to prevent states from providing "a tort remedy to a person about whom truthful, but intensely private, information of some interest to the public is published." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1230, 1232 (7th Cir. 1993) (citing *Fla. Star v. B.J.F.*, 491 U.S. 524, 541 (1989)).

*Haynes* recognizes the legitimacy of a right of action for the public disclosure of such private facts. Specifically, the "right of privacy" concept covers "several distinct wrongs," including publicizing "personal facts that while true and not misleading are so intimate that their disclosure to the public is deeply embarrassing to the person thus exposed and is perceived as gratuitous by the community"; and casting a person "in a false light by publicizing details of the person's life that while true are so selected or highlighted as to convey a misleading impression of the person's character." *Haynes*, 8 F.3d at 1229 (citations omitted).

Even though the law recognizes Plaintiff's cause of action, the tort has limits. To be actionable, the publication of private facts must relate to facts that would "make a reasonable person deeply offended by their publicity" and for which "the public has no legitimate interest." *Id.* at 1232 (citations omitted). Stated another way:

> People who do not desire the limelight and do not deliberately choose a way of life or course of conduct calculated to thrust them into it nevertheless have no legal right to extinguish it if the experiences that have befallen them are newsworthy, even if they would prefer that those experiences be kept private.

*Id.* The "two criteria, offensiveness and newsworthiness, are related"; meaning, the publication of intimate personal facts is most offensive when the public has no legitimate interest in knowing them "beyond the voyeuristic thrill of penetrating the wall of privacy that surrounds a stranger." *Id.*

Here, Defendants argue that Plaintiff's claim for public disclosure of private facts fails because the facts disclosed, even if intensely private, are newsworthy, public facts. Memorandum in Support of Defendant's Motion to Dismiss [25] at 8. Defendants concede that the Book shared private facts, which garnered significant publicity, but argue that there is "no reasonable dispute that the Book is about a matter of public concern." *Id.* at 8–10. Indeed, as explained above, Plaintiff concedes that the Title IX process and issues surrounding the occurrence and investigation of sexual assaults on college campuses constitute issues of legitimate public concern. *See* Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss [31] at 16. But finding that a particular topic constitutes a matter of public concern does not end the inquiry; the newsworthiness of the details disclosed must be weighed against their offensiveness. Here, Plaintiff argues that Defendants crossed the line and went far beyond what was necessary to provide context to such legitimate issues.

*Haynes* is instructive. In that case, the defendants wrote and published a book about the Great Migration that included, as part of a broader narrative, facts and details about the lives of specific migrants, one of whom (Ruby Lee Daniels) happened to be the ex-wife of the plaintiff. The book, which included "much about

other migrants, about the travails of Ruby's children, about discrimination against blacks in both the North and the South, and about the politics of poverty programs in Washington and Chicago," included embarrassing and unflattering facts about the plaintiff. 8 F.3d at 1224-26. Among other details, the book stated that the plaintiff left his children alone at night when he was supposed to be watching them, that he lost a job or jobs because of drinking, and that he spent money on a car instead of buying shoes for his children. *Id.* at 1226.

Weighing the offensiveness of the actual published statements as a whole against their newsworthiness, the court noted in *Haynes* that the reader of a book about the black migration to the North would have "no legitimate interest in the details of [the plaintiff's] sex life; but no such details are disclosed. Such a reader does have a legitimate interest in the aspects of [plaintiff's] conduct that the book reveals." *Id.* at 1232. In short, "[n]o detail in the book claimed to invade [plaintiff's] privacy is not germane to the story that the author wanted to tell, a story not only of legitimate but of transcendent public interest." *Id.* at 1233.

Under *Haynes*, therefore, this Court must ask not only whether Title IX and the investigation of sexual assaults on college campuses constitute matters of legitimate public concern (they plainly do), but also whether everything Defendants published was, for the purposes of a motion to dismiss, necessarily germane to that issue as a matter of law. After the discovery process develops a full evidentiary record, a reasonable jury might very well conclude that every factual statement made in Kipnis' book (including the facts about Plaintiff's consensual sexual

relationship with a different professor and the resulting fallout) is relevant and not gratuitous. To be sure, even though the intimate details of a person's sex life play no role in telling the story of the Great Migration, such details might be germane to the subjects of Title IX and the investigation of sexual assault complaints on college campuses. Given the current state of the record, however, that question cannot be answered now.

For present purposes, it is enough that Plaintiff has alleged that Defendants crossed the line and publicized intensely private facts, the publication of which purportedly served no legitimate public interest. Plaintiff alleges that the facts Kipnis revealed were not necessary to make her point; she deliberately published embarrassing details, without context, to fit the narrative she wanted to tell. Plaintiff claims that Kipnis used "the most intimate details of Plaintiff's life"–not just to prove her point about the Title IX process, but "as fodder." [31] at 16. On the record before the Court, it is simply not possible to decide as a matter of law whether Kipnis included gratuitous details to embarrass or undermine Plaintiff. *See Haynes*, 8 F.3d at 1233-34 (ordinarily the evaluation and comparison of offensiveness and newsworthiness would be, like other questions of the application of a legal standard to the facts of a particular case, matters for a jury). Accordingly, this Court cannot dismiss count one on this basis.

Defendants also argue that the "facts"–including Plaintiff's affair with her prior professor, her relationship with Ludlow (including their private text exchanges and communications), and the materials from Northwestern's Title IX

investigation—were already public when the Book was published, because they were "discussed in the Ludlow lawsuits." [25] at 12-13. Thus, Defendants argue, Plaintiff's claim for public disclosure of private facts fails because "the allegedly 'private' information Plaintiff identifies in this lawsuit was, in fact, not private at all: it has been public for years." *Id.* at 13. Plaintiff concedes that some of the facts published in the Book were within the public domain as a result of Ludlow's prior lawsuit. She argues, however, that much of what Kipnis wrote in the Book had not been previously revealed. Indeed, as Plaintiff points out, Kipnis admits as much in the Book's introduction:

> Ludlow's parting wave—he had nothing to lose by that point—was bestowing on me the files from his investigation: the Title IX reports and thousands of pages of background material . . . . It's an unprecedented behind-the-scenes view of just how haphazard and, frankly, incompetent the Title IX process can be. Reading it was incredibly eye-opening—in fact, a lot of what I read was shocking, and I'm not exactly unjaded when it comes to institutional power.

> The reason I'm relating Ludlow's story in the pages to come isn't because it happened on my campus, or because my campus is worse than others when it comes to sanctioning witch hunts. It's because a trove of documents landed in my lap, and the story they tell should see the light of day exactly because this *isn't* just Ludlow's story. From what I've learned in the last year and a half, these sorts of arbitrary and often outlandish tribunals are being conducted at colleges and universities all over the country, with accused faculty and students being stripped of their rights and, in many instances, simply hung out to dry to give the appearance that higher ed is mobilized against sexual assault.

Book at 32-33.  In light of these statements, the Court cannot find that the Book revealed only publicly-available information.

B.     Plaintiff's False Light Invasion of Privacy Claim (Count Two)

In count two of her complaint, Plaintiff alleges that "Defendants' actions in falsely portraying Plaintiff as having lied about a sexual assault allegation, as having given and then retracted consent to sex with Ludlow, and as having filed multiple Title IX complaints, including a prior complaint against a fellow student, placed Plaintiff in a false light before the public."  [1] ¶ 80.  Plaintiff alleges that the false light in which Defendants' conduct placed Plaintiff "would be highly offensive to a reasonable person" and that, in placing Plaintiff in such false light, Defendants "acted with actual malice; that is, they acted with knowledge that their statements were false or with reckless disregard for whether the statements were true of false."  *Id.* ¶¶ 81-82.  Plaintiff alleges that Defendants failed to "fact-check their sources" and that Kipnis knowingly omitted contrary evidence, presenting only the information that "fit her pre-determined narrative."  *Id.* ¶ 82.  Finally, Plaintiff alleges that she has been harmed and continues to be harmed by Defendants' actions: she alleges that she has experienced "economic and non-economic damages, including emotional distress and mental anguish, harm to reputation, harm to career, and harm to her education."  *Id.* ¶ 83.

As explained above, the law permits a cause of action for "[c]asting a person in a false light by publicizing details of the person's life that while true are so selected or highlighted as to convey a misleading impression of the person's

character." *Haynes*, 8 F.3d at 1229. Plaintiff does not appear to allege such a claim. Instead, count two appears to be based upon the publication of false statements. Indeed, Defendants argue that Plaintiff's false light claim fails because her defamation claim fails. *See* [25] at 19. As discussed below, however, the Court rejects the latter premise, and thus, declines to dismiss Plaintiff's false light claim on that basis.

Defendants also argue that Plaintiff's false light claim fails because she cannot plausibly allege actual malice. Malice, for this purpose, means "knowledge of falsehood or reckless disregard for whether the statements were true or false." *Boese v. Paramount Pictures Corp.*, 952 F. Supp. 550, 557 (N.D. Ill. 1996). Defendants' argument ignores the allegations of the complaint. Plaintiff alleges that Defendants "acted with actual malice; that is, they acted with knowledge that their statements were false or with reckless disregard for whether the statements were true or false." [1] ¶ 82. Beyond reciting the element of malice, Plaintiff also alleges supporting details regarding specific false statements made by Kipnis and the fact that Kipnis deliberately omitted evidence that contradicted the narrative Kipnis wanted to tell–namely, that the Title IX investigation process was a joke and that Plaintiff's Title IX complaint against Ludlow was based on a lie concerning her lack of consent to engage in a sexual relationship. *Id.* Plaintiff further alleges that HarperCollins failed to check Kipnis' sources, despite knowing that Kipnis may have had an axe to grind with respect to Plaintiff, who had not only complained about Kipnis' friend, but had also already complained about Kipnis. *Id.* Of course,

it remains to be seen whether the evidence will prove the truth of such allegations. But at this stage of the proceedings, this Court must accept Plaintiff's allegations as true. With the benefit of that presumption, Plaintiff's claim survives.

C.    <u>Plaintiff's Defamation Claim (Count Three)</u>

In count three of her complaint, Plaintiff alleges a claim of defamation. In Illinois, a defamatory statement is one that "tends to cause such harm to the reputation of another that it lowers that person in the eyes of the community or deters third persons from associating with him." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003); *Kolegas v. Heftel Broad. Corp.*, 607 N.E.2d 201, 206 (Ill. 1992). Here, Plaintiff alleges defamation *per se*. In such a claim, the alleged defamatory statements are so harmful to reputation that damages are presumed. *Muzikowski*, 322 F.3d at 924 (citing *Bryson v. News Am. Publ'ns, Inc.*, 672 N.E.2d 1207, 1214 (Ill. 1996). Illinois considers a limited number of categories of statements to be actionable *per se*, including those implying (1) commission of a crime, (2) infection with a venereal disease, (3) inability to perform or want of integrity in the discharge of public duties, or (4) fornication or adultery, and (5) words that prejudice a party in her trade, profession, or business. *Id.* (citing *Bryson*, 672 N.E.2d at 1214-15).

Plaintiff alleges that Kipnis' Book makes false statements about Plaintiff, including misleading misrepresentations that placed Plaintiff in a negative light. [1] ¶ 59. For example, Plaintiff says Kipnis wrote and caused to be published and HarperCollins published:

- False statements about the nature of Plaintiff's personal and professional relationship with Ludlow, suggesting that it was a consensual dating relationship and that Ludlow was not in a position of evaluative authority with respect to Plaintiff;

- The false assertion that Plaintiff initiated six Title IX complaints, including that she initiated a Title IX complaint against 'a fellow grad student;

- False statements that Plaintiff initiated two Title IX complaints against Kipnis, as well as a Title IX complaint against Kipnis' support person;

- False statements about the contents of Plaintiff's single Title IX complaint against Kipnis; and

- False statements throughout *Unwanted Advances* insinuating that Plaintiff is a liar who fabricated a false claim of rape against Ludlow to seek revenge against him.

*Id.* Plaintiff alleges that Kipnis' statements "were defamatory because they harmed Plaintiff's reputation by lowering her in the eyes of the community and deterring the community from associating with her." *Id.* ¶ 86. She further alleges that the statements were defamatory *per se* because the harm to Plaintiff "is obvious and apparent on its face"; Kipnis' statements insinuate that Plaintiff engaged in illegal conduct when she "manufactured a rape allegation against Ludlow." *Id.* ¶ 87. Additionally, Plaintiff alleges, the accusations that Plaintiff filed multiple Title IX complaints, including against a fellow student, and made up lies to harm professors, seek to undermine Plaintiff's reputation "in the overall community," as well as in the "small community of philosophy academia." *Id.* Plaintiff alleges that she was harmed and continues to be harmed as a result of these false statements in that she has experienced economic and non-economic damages, including emotional distress

and mental anguish and harm to her reputation, her career, and her education. *Id.* ¶ 89.

These allegations state a viable claim of defamation *per se*. Taking Plaintiffs allegations as true, as the Court must here, Plaintiff challenges statements suggesting she has committed a crime and statements that prejudice her in her profession. Indeed, the opening salvo of Kipnis' chapter on Plaintiff, entitled "Flip-Flopping on Consent: A 'Yes' Becomes a 'No' Years After the Fact," states:

> Sexual consent can now be retroactively withdrawn (with official sanction) years later, based on changing feelings or residual ambivalence, or new circumstances. Please note that this makes anyone who's ever had sex a potential rapist.

Book at 91. Kipnis effectively accuses Plaintiff of fabricating a rape charge against Ludlow. Plaintiff also claims that Kipnis has accused her of being a "serial title IX filer" who "makes up lies to harm professors," which is the "kiss of death" in the small community of philosophy academia. *See* [31] at 8.

Defendants argue that Plaintiff's defamation claim should be dismissed because Plaintiff failed to plead it with the requisite specificity and because the challenged statements are either not defamatory, as a matter of law, or are protected expressions of opinion. Initially, the Court rejects Defendants' specificity argument. Plaintiff alleges defamation *per se*; such a claim is not covered "under the special pleading regime of Rule 9," but is subject to "the usual rules for notice pleading established by Rule 8." *Muzikowski*, 322 F.3d at 926. Additionally, the nature of the Book is such that it provides numerous factual statements seemingly

intended to paint a broad picture of Plaintiff as a liar, who falsely accused a professor of taking advantage of her and subjecting her to unwanted sexual advances, ultimately forcing her to engage in nonconsensual sex. Thus, under Defendants' theory, Plaintiff would have to reproduce the entirety of chapter two. Plaintiff's allegations suffice to place Defendants on notice of the bases of her defamation claim. Plaintiff cited the specific publication at issue (the Book) and provided specific categories of harmful statements; any additional particulars can be fleshed out in discovery.

Defendants next argue that the challenged statements are nonactionable statements of opinion. "Opinions that do not misstate actual facts are protected by the First Amendment and thus non-actionable." *Huon v. Denton*, 841 F.3d 733, 743 (7th Cir. 2016). Initially, Plaintiff alleges that Kipnis' opinions *do* misstate actual facts and present the facts in a misleading context. But putting that aside, the challenged speech constitutes statements of fact, not opinion.

Illinois courts rely upon three factors to distinguish factual assertions from opinions: "(1) whether the statement has a precise and readily understood meaning; (2) whether the statement is verifiable; and (3) whether the statement's literary or social context signals that it has factual content." *Id.* at 743-44 (quoting *Maki Constr. Co. v. Chi. Reg'l Council of Carpenters*, 882 N.E.2d 1173, 1183 (Ill. App. Ct. 2008)). Generally, "name calling," "rhetorical hyperbole," and words "employed only in a loose, figurative sense" are nonactionable. *Id.* (quoting *Pease v. Int'l Union of Operating Eng'rs Local 150*, 567 N.E.2d 614, 619 (Ill. App. Ct. 1991)).

The challenged statements about Plaintiff's Title IX complaints–including statements that Plaintiff initiated six Title IX complaints, including one against a fellow graduate student, two against Kipnis and one against Kipnis' support person–are plainly factual. They are precise and verifiable. Categories of statements about the contents of Plaintiff's Title IX complaints, statements about Plaintiff's relationship with Ludlow, and statements insinuating that Plaintiff is a liar, could potentially include statements that could be characterized as opinion. Had Kipnis simply published a statement that Plaintiff's relationship with Ludlow was consensual, or that Plaintiff is a liar, Defendants would have a better argument for dismissal on this basis.

But Kipnis did not just publish her opinion that Plaintiff lied in her Title IX complaint; she published all of the facts that she used to formulate that opinion. Kipnis did not simply publish her opinion that the Title IX process remains flawed; she published factual specifics about Plaintiff's relationships, including among other things, whom she dated, where she slept, what she wore at the time, and what she said to her sexual partners. Those statements, alleged as false as outlined above, are interwoven in the Book with true, private statements about Plaintiff (the categories of statements upon which count one rests). *See, e.g.*, Book at 123-24 ("To date, she's filed *six* Title IX complaints—or six that I know of . . . [t]wo of them were against me, which probably colors my thinking about serial charge-bringers.").

Kipnis' statements can reasonably be seen as assertions of fact, not only for their place within Kipnis' narrative prose, but because Kipnis herself characterizes

them as facts in the Book. Kipnis portrays herself in the Book as a crusader against the injustice resulting from the Title IX process, with inside factual information never before available, thereby signaling that her statements are not just opinions. *Unwanted Advances* provides a lengthy juxtaposition of Kipnis' opinions based upon purported facts (some of which Plaintiff concedes are true but private, others which Plaintiff alleges are false) from these confidential documents. The test is "not whether the story is or is not characterized as 'fiction,' or 'humor,' but whether the charged portions, in context, could be reasonably understood as describing actual facts about the plaintiff or actual events in which she participated." *Bryson*, 672 N.E.2d at 1220; *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (noting that *Gertz v. Robert Welch, Inc.* was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion'"). That is the case here.

Finally, Defendants argue that Plaintiff's claim should fail as a matter of law because "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish" actual malice to warrant defamation. [25] at 19 (citing *Harte-Hanks Comm. Inc., v. Connaughton*, 491 U.S. 657, 688 (1989)). Taken in context, however, the case Defendants cite actually undermines their request for dismissal prior to a development of a full evidentiary record:

> We have not gone so far, however, as to accord the press absolute immunity in its coverage of public figures or elections. If a false and defamatory statement is published with knowledge of falsity or a reckless disregard for the truth, the public figure may prevail. A

"reckless disregard" for the truth, however, requires more than a
departure from reasonably prudent conduct. "There must be sufficient
evidence to permit the conclusion that the defendant in fact
entertained serious doubts as to the truth of his publication." The
standard is a subjective one-there must be sufficient evidence to permit
the conclusion that the defendant actually had a "high degree of
awareness of ... probable falsity." As a result, failure to investigate
before publishing, even when a reasonably prudent person would have
done so, is not sufficient to establish reckless disregard. In a case such
as this involving the reporting of a third party's allegations,
"recklessness may be found where there are obvious reasons to doubt
the veracity of the informant or the accuracy of his reports."

*Harte-Hanks*, 491 U.S. at 688. Here, as explained above, Plaintiff alleges that

HarperCollins knew Kipnis had a motive to retaliate against Plaintiff, but

nonetheless failed to verify her sources or test the veracity of her prose. Even

though the ultimate issue of "whether the evidence in the record in a defamation

case is sufficient to support a finding of actual malice" remains a question of law,

the evidentiary record does not yet exist. *Id.* at 685. For now, taking the allegations

as true, Plaintiff's claim survives at this stage of the case.

    D.    <u>Plaintiff's IIED Claim (Count Four)</u>

    Finally, Defendants seek to dismiss Plaintiff's claim for intentional infliction

of emotional distress (count four). To state an IIED claim, plaintiffs must allege

that: (1) the defendants' conduct was "extreme and outrageous;" (2) defendants

either intended that their conduct inflict severe emotional distress or knew that

there was at least a high probability that their conduct would cause severe

emotional distress; and (3) defendants' conduct in fact caused severe emotional

distress. *E.g.*, *Doe v. Univ. of Chi.*, No. 16 C 08296, 2017 WL 4163960, at *11 (N.D.

Ill. Sept. 20, 2017) (citing *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 59 (Ill.

2016), *reh'g denied* (Mar. 27, 2017)).  The bar for extreme and outrageous conduct is high in that the conduct must "go beyond all possible bounds of decency, and [be] regarded as intolerable in a civilized community."  *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009).  Emotional harm experienced by IIED plaintiffs must be "so severe that no reasonable [person] could be expected to endure it."  *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d. 679, 684 (Ill. App. Ct. 1999).

Plaintiff alleges that Defendants published "an entire book that—page after page—exposes extremely private and painful parts of Plaintiff's life, makes false statements about her conduct, brands her a vengeful liar, and turns this promising young graduate student's life upside down for the entire world to see."  [1] ¶ 91. Making matters worse, Plaintiff alleges, Defendants then promoted the Book widely, compounding the harm to Plaintiff.  *Id.* ¶ 93.  Plaintiff alleges that Kipnis was "blatant and unapologetic" about her "lack of regard for the legal requirements of Title IX and whether breaching confidentiality and writing about Plaintiff was legally allowed and would cause harm"; moreover, Defendants never bothered to reach out to Plaintiff before proceeding with the Book "to check facts or to determine whether proceeding would harm Plaintiff."  *Id.* ¶ 94.  Finally, with regard to the degree of harm, Plaintiff alleges that no reasonable person "could be expected to endure being made the focal point of a campaign by a professor at her own University not only to discredit the school's Title IX policies and procedures, but also to discredit the student herself in her own academic community and far beyond."  *Id.* ¶ 95.

Defendants argue that Plaintiff's IIED claim fails because: (1) speech on a matter of public concern cannot provide the basis for an IIED claim; (2) the First Amendment bars any IIED claim based on speech about matters of public concern where the plaintiff failed to plead the fault requirements for a defamation claim; and (3) Plaintiff otherwise fails to plead the elements of an IIED claim. [25] at 19. The Court's analysis concerning Plaintiff's defamation claims disposes of Defendants' first two arguments. The Court also rejects the third, as Plaintiff's allegations suffice at this point in the proceedings.

Defendants' conduct, as described in the complaint, could be seen by a reasonable jury as extreme and outrageous. Taking Plaintiff's allegations as true, Kipnis documented a false and misleading account of Plaintiff's travails, taking facts out of context and falsely characterizing confidential investigation materials, to paint Plaintiff as a liar–and not just any liar, but a liar about matters of sexual conduct, sexual consent and allegations of rape. Worse yet, Kipnis did so to get revenge on Plaintiff, a graduate student at the same university, for complaining about the alleged sexual predation of a professor and for complaining about Kipnis' initial attack on Plaintiff. Allowing such content to be published, with knowledge of the parties' history and without any investigation (which is what Plaintiff alleges HarperCollins did) could also satisfy the extreme and outrageous standard.

III.    <u>Conclusion</u>

For the reasons explained above, the Court finds that Plaintiff's allegations suffice to state claims of publication of private facts, false light invasion of privacy, defamation, and intentional infliction of emotion distress. As a result, the Court denies Defendants' motion to dismiss [24].


Dated: March 6, 2018

Entered:

John Robert Blakey
United States District Judge